1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

8    SULAYMAN SARR,

9                        Petitioner,          CASE NO. 2:24-cv-01293-RAJ-BAT

10        v.                                   **REPORT AND
                                              RECOMMENDATION**
11    IMMIGRATION AND CUSTOMS
     ENFORCEMENT FIELD OFFICE
12    DIRECTOR,

13         Petitioner Sulayman Sarr is currently detained by United States Immigration and

14    Customs Enforcement ("ICE") at the Northwest ICE Processing Center ("NWIPC") in Tacoma,

15    Washington. Dkt. 6. Petitioner has filed a petition for writ of habeas corpus pursuant to 28

16    U.S.C. § 2241 seeking release from detention or, in the alternative, a bond hearing. *Id.* at 1, 41.

17    Petitioner also appears to include a request for a temporary restraining order ("TRO") in the

18    body of his petition. *Id.* at 33-36. The Government has filed a return memorandum and motion to

19    dismiss along with a supporting declaration and exhibits. Dkt. 9. Petitioner has filed a response

20    opposing the motion to dismiss along with several supporting declarations. Dkts. 13, 14, 15, 16,

21    17, 18, 19, 20, 21, 22.

22         Petitioner has also filed a motion to substitute the Respondent. Dkt. 12. The Government

23    did not file a response to that motion.

REPORT AND RECOMMENDATION - 1

Having considered the petition, the Government's motion, the briefs, and exhibits submitted by the parties, and the balance of the record, the Court recommends that the Government's motion to dismiss (Dkt. 9) and Petitioner's federal habeas petition (Dkt. 6) should be GRANTED in part and DENIED in part. Specifically, the Court recommends that Petitioner's request for release should be DENIED but that his request for a bond hearing should be GRANTED. Petitioner's request for a TRO (Dkt. 6) should be DENIED as moot. The Court further recommends that Petitioner's motion to substitute (Dkt. 12) be GRANTED and that Bruce Scott, the warden of NWIPC, be substituted as the Respondent in this action.

## BACKGROUND

Petitioner is a native and citizen of Gambia, who arrived in the United States in 2007. Dkt. 9-2 (Record of Deportable, Inadmissible Alien) at 1. On July 29, 2021, Petitioner was convicted of felony conspiracy to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 846, and was sentenced to two years in federal prison by the United States District Court for the District of Utah. *Id.* at 1-2.

On February 1, 2023, Petitioner was released from federal prison and taken into custody by the Department of Homeland Security (DHS) on the basis that he was a criminal noncitizen (having committed an aggravated felony relating to drug trafficking and a drug conviction) and was subject to removal based on administrative charges warranting mandatory detention. Dkt. 9-2 at 1-2; Dkt. 9-3 (Notice to Appear, dated February 1, 2023) at 1-4; 8 U.S.C. § 1226(c); Dkt. 9-7 (Immigration Judge (IJ) Order of Removal, dated Aug. 30, 2023) at 1-2. Petitioner subsequently admitted that he was removable as a criminal noncitizen pursuant to 8 U.S.C. §§ 1127(a)(2)(A)(iii) and 1127(a)(2)(B)(i). Dkt. 9-7 (IJ Order of Removal, dated Aug. 30, 2023) at 1-2.

REPORT AND RECOMMENDATION - 2

1    On February 14, 2023, Petitioner appeared in Immigration Court for a removal hearing.

2    Dkt. 9-4 (Immigration Removal Hearing, dated Feb. 14, 2023). At the hearing Petitioner

3    requested and was granted a continuance in order to seek counsel. *Id.* at 17. On March 7, 2023,

4    Petitioner appeared in Immigration Court and requested and was granted a continuance to seek

5    counsel and to prepare his documents. Dkt. 9-5 (Immigration Removal Hearing, dated Mar. 7,

6    2023) at 2, 8-9. On March 28, 2023, Petitioner appeared in Immigration Court and requested and

7    was granted a continuance to April 18, 2023, in order to obtain some supporting documents for

8    his application for asylum. Dkt. 9-6 (Immigration Removal Hearing, dated Mar. 28, 2023) at 2-5.

9    Petitioner subsequently applied for "asylum and withholding of removal under sections

10   208(b)(1)(A) and 241(b)(3)(A) of the INA, 8 U.S.C. §§ 1158(b)(1)(A), 1231(b)(3)(A), and

11   protection under the regulations implementing the Convention Against Torture ("CAT")." Dkt.

12   9-8 (Board of Immigration Appeals ("BIA") Final Order of Removal, dated Jan 18, 2024) at 1;

13   Dkt. 9-7 at 2. On August 30, 2024, the IJ issued an order denying Petitioner's requests for relief,

14   protection, and deferral and ordering Petitioner removed. Dkt. 9-7 at 3-10; Dkt. 9-8.

15   Petitioner appealed the IJ's order of removal to the Board of Immigration Appeals

16   ("BIA"). Dkt. 9-8. On January 18, 2024, the BIA dismissed the appeal, finding Petitioner had not

17   challenged the IJ's determination that he was convicted of a particularly serious crime and was

18   thus ineligible for "asylum, statutory withholding of removal, and withholding of removal under

19   the CAT", affirming the IJ's denial of the Petitioner's request for deferral of removal under the

20   CAT, and issuing a final administrative order of removal. *Id.* at 1-3.

21   On February 14, 2024, Petitioner appealed the final administrative order of removal by

22   filing a petition for review with the Ninth Circuit Court of Appeals under case number 24-791.

23   Dkt. 9-9 (9th Cir. Dkt. No. 24-791, PACER Sheet); *Sarr v. Garland*, No. 24-791 (9th Cir. filed

Feb. 14, 2024). Petitioner also filed a motion for temporary stay of removal which was granted by the Ninth Circuit pursuant to General Order 6.4(c). Dkt. 9-9 at 3; *Sarr v. Garland*, No. 24-791 (9th Cir. filed Feb. 14, 2024). The Ninth Circuit issued a scheduling order setting deadlines to complete briefing by June 3, 2024. *Id.* Petitioner moved for appointment of counsel and on May 28, 2024, the Ninth Circuit granted the motion and subsequently vacated the briefing schedule. *Id.*

The Government filed opposition to Petitioner's motion for a stay of removal and moved to dismiss the case. *Id.* On October 22, 2024, the Ninth Circuit Court of Appeals issued an order granting the Government's motion and dismissing Petitioner's appeal on the grounds that the BIA's January 18, 2024, decision was vacated by a subsequent decision by the BIA issued on February 14, 2024. *See Sarr v. Garland*, No. 24-791 (9th Cir. filed Feb. 14, 2024), ECF 19.

Petitioner indicates in his petition that he filed a motion to reopen removal proceedings after the BIA issued its January 18, 2024, decision on the grounds that he was never issued a briefing schedule or transcript for his initial appeal of the IJ's decision. Dkt. 6 at 16. He indicates it then took the BIA an "additional 7 months to adjudicate the merits of his case." *Id.* Petitioner argues that "the Court of Appeals for the Ninth Circuit lost it's [sic] jurisdiction over the case [under case number 24-791], when the BIA granted interim for its failure to issue 'briefing schedule' and 'transcript' to petitioner." Dkt. 13 at 9. Petitioner indicates there is now another case pending in the Ninth Circuit Court of Appeals under case number 24-5264 wherein counsel has been appointed and a motion for stay of removal is pending. *Id.* While not entirely unclear, it appears petitioner is indicating that the BIA granted his motion to reopen, vacated its January 18, 2024, decision and reopened his removal proceedings, and then issued a subsequent decision ordering him removed which he has now appealed to the Ninth Circuit under case number 24-

5264. *Id.*; *see Sarr v. Garland*, No. 24-5264 (9th Cir. filed August 27, 2024). The docket in the Ninth Circuit Court of Appeals indicates that this new appeal under case number 24-5264 (apparently appealing the BIA's subsequent decision issued on July 29, 2024) is in its early stages – Petitioner has been appointed counsel, has moved to stay his removal, and a briefing schedule has been set for the appeal.[1] *Sarr v. Garland*, No. 24-791 (9th Cir. filed August 27, 2024).

## DISCUSSION

Petitioner asserts in this action that his continued detention by ICE, which now exceeds 21 months, violates his due process rights under the Fifth Amendment. Dkt. 6. Petitioner requests that the Court order his release from custody or, in the alternative, order an individualized bond hearing. *Id.* The Government argues that the petition should be dismissed for two reasons: (1) because Petitioner has failed to name his immediate custodian and therefore the Court lacks jurisdiction; and (2) because Petitioner's detention is statutorily authorized under 8 U.S.C. § 1226(c) and comports with due process. Dkt. 9. Petitioner has also moved to substitute Bruce Scott, the warden of the NWIPC, as the Respondent. Dkt. 12. The Government has not opposed or otherwise responded to Petitioner's motion to substitute.

### A. Proper Respondent

In his petition, Petitioner names the "Immigration and Customs Enforcement Field Officer Director" as the Respondent. Dkt. 6. The Government moves to dismiss the petition for lack of jurisdiction arguing that the Petitioner has failed to name the proper respondent – the

---

[1] Although the record before the Court does not appear to contain a copy of Petitioner's motion to reopen or a copy of the subsequent BIA decision, the record in the two Ninth Circuit cases appears to generally support Petitioner's assertions and the Government has not disputed or otherwise responded to Petitioner's assertions regarding this portion of the procedural history.

warden of the facility where the Petitioner is being held. Dkt. 9 at 6-9. Petitioner has separately

moved to substitute Bruce Scott, the warden of NWIPC, as the Respondent in this matter. Dkt.

12. The Government did not oppose or otherwise respond to Petitioner's motion to substitute.

"[L]ongstanding practice confirms that in habeas challenges to present physical

confinement—'core challenges'—the default rule is that the proper respondent is the warden of

the facility where the prisoner is being held ...." *Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004).

In *Doe v. Garland*, the Ninth Circuit recently "affirm[ed] the application of the immediate

custodian and district of confinement rules to core habeas petitions filed pursuant to 28 U.S.C. §

2241, including those filed by immigrant detainees." 109 F.4th 1188 (9th Cir. 2024). Generally, a

habeas petitioner's failure to name a proper respondent requires dismissal of the petition for lack

of personal jurisdiction. *Stanley v. California Supreme Court*, 21 F.3d 359, 360 (9th Cir. 1994).

However, a court should grant a petitioner "leave to amend his petition to correct this technical

deficiency." *Dubrin v. California*, 720 F.3d 1095, 1100 (9th Cir. 2013); *Le v. Field Off. Dir., San

Francisco Field Off.*, No. 1:24-CV-01272, 2024 WL 4534728, at *1 (E.D. Cal. Oct. 21, 2024).

Petitioner is detained at the NWIPC in Tacoma Washington. Pursuant to the Ninth

Circuit's recent decision in *Doe*, "[u]nder *Padilla*, [Petitioner] must name his immediate

custodian … as the respondent to his petition." *Doe*, 109 F.4th at 1199. Petitioner did not

originally name the warden of the NWIPC as the Respondent, instead naming the Immigration

and Customs Enforcement Field Officer Director. Dkt. 6. But Petitioner has now moved to

substitute Bruce Scott, the warden of NWIPC, as the Respondent and the Government did not

oppose or otherwise respond to the Petitioner's motion.

Accordingly, the Court should deny the Government's motion to dismiss the petition for lack of jurisdiction (Dkt. 9) and should grant Petitioner's motion to substitute Bruce Scott as the Respondent (Dkt. 12).

**B.    Statutory Basis for Petitioner's Detention**

Title 8 U.S.C. § 1226 provides the framework for the arrest, detention, and release of non-citizens who are in removal proceedings. 8 U.S.C. § 1226; *see also Demore v. Kim*, 538 U.S. 510, 530 (2003) ("Detention during removal proceedings is a constitutionally permissible part of that process."); *Avilez v. Garland*, 69 F.4th 525, 529-530 (9th Cir. 2023). Section 1226(a) grants DHS the discretionary authority to determine whether a non-citizen should be detained, released on bond, or released on conditional parole pending the completion of removal proceedings, unless the non-citizen falls within one of the categories of criminals described in § 1226(c), for whom detention is mandatory until removal proceedings have concluded. 8 U.S.C. § 1226; *Jennings v. Rodriguez*, 583 U.S. 281, 303-06 (2018). "Subsection C applies throughout the administrative and judicial phases of removal proceedings ...." *Avilez*, 69 F.4th at 535. This means that individuals who are detained under Section 1226(c) "are not statutorily eligible for release on bond during the judicial phase of the proceedings, except under the narrow circumstances defined by § 1226(c)(2) [where DHS determines release is necessary for witness-protection purposes and the noncitizen will not pose a danger or flight risk.]" *Id.* at 535-36; 8 US.C. § 1226(c).

Section 1226(c) includes any non-citizen who "is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title." 8 U.S.C. § 1226(c)(1)(B). In this case, Petitioner was determined to be removable for

having committed an offense covered in 8 U.S.C. §§ 1227(a)(2)(A)(iii)[2] and 1127(a)(2)(B)(i)[3].

Dkt. 9-2 at 1-2; Dkt. 9-7 at 2. Specifically, Petitioner was convicted of felony conspiracy to

distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 846.[4]

As such, Petitioner's detention is statutorily mandated by § 1226(c) until his removal

proceedings have concluded. Accordingly, Petitioner is not statutorily entitled to release or a

bond hearing.

C.    **Due Process**

Even if Petitioner's continued detention is statutorily permitted under 8 U.S.C. § 1226(c),

it must also comport with due process. Petitioner argues that his ongoing detention has become

prolonged and unreasonable and violates his due process rights, and that he is therefore entitled

---

[2] Title 8 U.S.C. § 1227(a)(2)(A)(iii) provides that "[a]ny [noncitizen] who is convicted of an aggravated felony at any time after admission is deportable." Title 8 U.S.C. § 1101(a)(43)(B) defines the term "aggravated felony" to include "illicit trafficking in a controlled substance (as defined in section 802 of Title 21), including a drug trafficking crime (as defined in section 924(c) of Title 18)." Title 18 U.S.C.A. § 924(c)(2) states the "term "drug trafficking crime" means any felony punishable under the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or chapter 705 of title 46."

[3] Title 8 U.S.C. § 1227(a)(2)(B)(i) provides that "[a]ny [noncitizen]who at any time after admission has been convicted of a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States, or a foreign country relating to a controlled substance (as defined in section 802 of Title 21), other than a single offense involving possession for one's own use of 30 grams or less of marijuana, is deportable."

[4] Title 21 U.S.C. § 841(a)(1) provides "[e]xcept as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally – (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute or dispense, a controlled substance[.]" Title 21 U.S.C. § 846 provides "[a]ny person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." Sections 841(a)(1) and 846 are felonies punishable under the Controlled Substances Act (21 U.S.C. §§ 801 et seq.) and would therefore appear to be drug trafficking crimes as defined in Title 18 U.S.C.A. § 924(c)(2). *See United States v. Ochoa-Anaya*, No. 1:19-CR-0021, 2024 WL 3967471, at *6 (E.D. Cal. Aug. 28, 2024) ("Section 846 is part of the Controlled Substances Act (21 U.S.C. §§ 801 et seq.) [...] the underlying § 846 violation is a 'felony punishable under the Controlled Substances Act' and falls within § 924(c)(2)'s definition of a 'drug trafficking crime.'" The Court notes that Petitioner does not appear to challenge the finding that he is deportable under 8 U.S.C. §§ 1227(a)(2)(A)(iii) and 1127(a)(2)(B)(i) based on his conviction, nor would there appear to be a basis to do so.

1    to release or a bond hearing. Dkt. 6. Respondent argues that Petitioner's continued detention is

2    reasonable and comports with due process. Dkt. 9.

3        In *Demore*, the Supreme Court rejected a due process challenge to § 1226(c) explaining

4    that Congress drafted § 1226(c) to respond to the high rates of crime and flight by removable

5    non-citizens convicted of certain crimes and holding that "the Government may constitutionally

6    detain deportable [non-citizens] during the limited period necessary for their removal

7    proceedings." 538 U.S at 518-21, 526. The Supreme Court emphasized the relatively "brief"

8    nature of the mandatory detention under § 1226(c), which has "a definite termination point" that,

9    in most cases, resulted in detention of less than about five months. *Id.* at 529-30. Justice

10   Kennedy's concurring opinion, which created the majority, reasoned that under the Due Process

11   Clause, a non-citizen could be entitled to "an individualized determination as to his risk of flight

12   and dangerousness if the continued detention became unreasonable or unjustified." *Id.* at 532.

13       Since the Supreme Court's decision in *Demore*, the Ninth Circuit has expressed "grave

14   doubts that any statute that allows for arbitrary prolonged detention without any process is

15   constitutional or that those who founded our democracy precisely to protect against the

16   government's arbitrary deprivation of liberty would have thought so." *Rodriguez v. Marin*, 909

17   F.3d 252, 256 (9th Cir. 2018). While it ultimately remains an open question in the Ninth Circuit

18   whether due process requires a bond hearing for noncitizens detained under 8 U.S.C. § 1226(c)[5],

19   many district courts that have considered the constitutionality of prolonged mandatory

20   detention—including judges in this District—"agree that prolonged mandatory detention pending

21

22   ───────────────
     [5] *See Avilez*, 69 F.4th at 538 (declining to rule on the question of whether due process required a bond
     hearing for a non-citizen detained under § 1226(c) and remanding to the district court to consider that
23   claim); *Martinez v. Clark*, 36 F.4th 1219, 1223 (9th Cir. 2022), *judgment vacated on other grounds*, 144
     S.Ct. 1339 (2024) ("Whether due process requires a bond hearing for [noncitizens] detained under §
     1226(c) is not before us today. And we take no position on that question.").

removal proceedings, without a bond hearing, 'will—at some point—violate the right to due process.'" *Martinez v. Clark*, 2019 WL 5968089, at *6 (W.D. Wash. May 23, 2019), *report and recommendation adopted*, 2019 WL 5962685 (W.D. Wash. Nov. 13, 2019) (quoting *Sajous v. Decker*, 2018 WL 2357266, at *8 (S.D.N.Y. May 23, 2018), and collecting cases); *see also Djelassi v. ICE Field Office Director*, 434 F. Supp. 3d 917, 923-24 (W.D. Wash. 2020) (granting habeas petition and ordering bond hearing for non-citizen whose mandatory detention had become unreasonably prolonged).

In cases involving § 1226(c), where the noncitizen has not previously received a bond hearing, judges in this District have adopted and applied a "multi-factor analysis that many other courts have relied upon to determine whether § 1226(c) detention has become unreasonable."[6] *Martinez*, 2019 WL 5968089, at *6-7. Under this analysis, referred to as "the *Martinez* test", the Court considers the following factors:

> (1) the total length of detention to date; (2) the likely duration of future detention; (3) whether the detention will exceed the time the petitioner spent in prison for the crime that made him [or her] removable; (4) the nature of the crimes the petitioner committed; (5) the conditions of detention; (6) delays in the removal proceedings caused by the petitioner; (7) delays in the removal proceedings caused by the government; and (8) the likelihood that the removal proceedings will result in a final order of removal.

*Id.* at *9.

Accordingly, the Court will apply these factors to evaluate whether Petitioner's detention has become unreasonable, thereby violating due process.

---

[6] The Court notes that where a noncitizen is detained under § 1226(c) and has received at least one prior bond hearing, the Court generally applies the three-factor test set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1979). *See, e.g., Ortuno-Perez v. ICE Filed Off. Dir.*, No. 2:23-cv-344-BHS-DWC, 2023 WL 5807305 (W.D. Wash., Aug. 1, 2023) *report and recommendation adopted*, 2023 WL 5802516(W.D. Wash., Sept. 7, 2023); *Rubin v. United States Immigr. & Customs Enf't Field Off. Dir.*, No. 2:24-CV-00260-TL-TLF, 2024 WL 3431914, at *2 (W.D. Wash. June 28, 2024), *report and recommendation adopted*, 2024 WL 3431163 (W.D. Wash. July 16, 2024).

REPORT AND RECOMMENDATION - 10

1      *1.     Length of Detention to Date*

2      The first factor, the length of detention to date, is considered the most important factor in

3 the analysis. *See*, *e.g.*, *Martinez*, 2019 WL 5968089, at *9; *Sajous*, 2018 WL 2357266, at *10.

4 Under this factor, the longer mandatory detention continues under 8 U.S.C. § 1226(c) beyond the

5 "brief" period authorized in *Demore*, the harder it becomes to justify without conducting an

6 individualized bond hearing. *See, e.g.*, *Martinez*, 2019 WL 5968089, at *9 (finding nearly 13-

7 month detention weighed in favor of granting a bond hearing); *Liban M.J. v. Sec'y of Dep't of*

8 *Homeland Sec.*, 367 F. Supp. 3d 959, 963-64 (D. Minn. 2019) ("Although there is no bright-line

9 rule for what constitutes a reasonable length of detention, Petitioner's [approximately 12-month]

10 detention has lasted beyond the 'brief' period assumed in *Demore*."); *Sajous*, 2018 WL 2357266,

11 at *10 ("[D]etention that has lasted longer than six months is more likely to be 'unreasonable',

12 and thus contrary to due process, than detention of less than six months."); *Juarez v. Wolf*, No.

13 C20-1660-RJB-MLP, 2021 WL 2323436 (W.D. Wash. May 5, 2021) (finding detention of 14

14 months weighed in favor of granting a bond hearing).

15      In this case, when Petitioner filed his petition, he had been detained for an ongoing period

16 of eighteen months and, at this point, his detention has extended to over twenty-one months.

17 Because Petitioner's detention has extended significantly beyond the "brief" period presumed

18 reasonable in *Demore*, the Court finds this factor weighs in Petitioner's favor.

19      *2.     Likely Duration of Future Detention*

20      The second factor the Court considers is "how long the detention is likely to continue

21 absent judicial intervention; in other words, the anticipated duration of all removal proceedings

22 including administrative and judicial appeals." *Martinez*, 2019 WL 5968089, at *9. Here, the

23 record shows Petitioner's petition for review in his *current* pending appeal (under case number

24-5264) was filed with the Ninth Circuit on August 27, 2024. *See Sarr v. Garland*, No. 24-5264 (9th Cir. filed August 27, 2024)

According to the Ninth Circuit's public website, it takes approximately 6 to 12 months from the date of the notice of appeal to oral argument and, following argument, most cases take three months to a year for the Court of Appeals to decide the case. *See* U.S. Court of Appeals for the Ninth Circuit, Frequently Asked Questions, www.ca9.uscourts.gov/content/faq.php (last accessed November 7, 2024).

A review of the docket in Petitioner's current pending appeal (under case number 24-5264) indicates that the opening brief is due January 2, 2025, the answering brief is due February 3, 2025, and the optional reply brief is due within 21 days after service of the answering brief. Thus, briefing is not due to be completed for at least another three months. *see Sarr v. Garland*, No. 24-5264 (9th Cir. filed August 27, 2024). Accordingly, while the Court cannot definitively determine the duration of petitioner's future detention, based upon the current record, it appears likely he will face many more months and potentially years in detention. *See Barraza v. ICE Filed Office Director*, No. C23-1271-BHS-MLP, 2023 WL 9600946, at *6 (W.D. Wash. Dec. 8, 2023) (citing the Ninth Circuit website's timeline for appeals and noting that under this timeline a petitioner who filed his petition for review a few months prior could be facing two years or more of additional time in custody).

The Court notes that the Government, in their motion to dismiss, argues that the only issue remaining to be decided with respect to Petitioner's immigration proceedings is the Government's motion to dismiss filed with respect to Petitioner's appeal under case number 24-791 and that, therefore, this factor should weigh in the Government's favor. Dkt. 9 at 17. But the record shows that that the appeal under case number 24-791 was dismissed on October 22, 2024,

REPORT AND RECOMMENDATION - 12

1    for lack of jurisdiction. *Sarr v. Garland*, No. 24-791 (9th Cir. filed Feb. 14, 2024), ECF 19. The

2    Court of Appeals found the BIA's January 18, 2024, order (which was on appeal in case number

3    24-791) was no longer a final order of removal because the decision was vacated by the BIA's

4    February 14, 2024, decision. *Id.* It appears that the Petitioner's petition for review of the

5    subsequent BIA order, issued on July 29, 2024, was filed with the Ninth Circuit on August 27,

6    2024 (under case number 24-5264). *See Sarr v. Garland*, No. 24-5264 (9th Cir. filed August 27,

7    2024). The Government was or should have been aware of this new appeal (and its potential

8    bearing on this factor of the *Martinez* test) when it filed the motion to dismiss this case but failed

9    to address the current appeal entirely. The Government also had the opportunity to address this

10   issue by filing a reply responding to the Petitioner's arguments regarding this subsequent appeal

11   but again failed to do so.

12        Accordingly, on the current record, the Court finds this factor weighs in favor of

13   Petitioner.

14        *3.    Criminal History*

15        Under the third and fourth factors, the Court reviews the length of detention compared to

16   the time Petitioner spent in prison for the crime that made him removable and the nature of his

17   crime. *Martinez*, 2019 WL 5968089, at *9; *Cabral v. Decker*, 331 F. Supp. 3d 255, 262

18   (S.D.N.Y. 2018). These factors are considered because they are relevant to whether the detainee

19   is a danger to the community or a risk of flight such that a bond hearing would be futile. *See*

20   *Cabral*, 331 F. Supp. 3d at 262.

21        Here, Petitioner's criminal conviction for conspiracy to distribute methamphetamine

22   resulted in a 24-month sentence, but he was ultimately confined for approximately 16 months.

23   Dkt. 6 at 17-18. At this point, the length of Petitioner's detention has exceeded the amount of

time he spent in prison for the crime he committed by several months. Although Petitioner's detention has not yet exceeded his original criminal sentence of 24 months, given the status of his appeal in the Ninth Circuit, it appears very likely that it will. Accordingly, the Court finds this third factor weighs in Petitioner's favor.

With respect to the nature of the crime, Petitioner was convicted of a serious felony, conspiracy to distribute methamphetamine, and was sentenced to 24 months in prison. The IJ's decision ordering Petitioner removed reflects that during questioning in his removal proceedings, Petitioner "indicated that because of a debt that was owed to him, in order to recoup money, he essentially agreed to take delivery of methamphetamine on multiple occasions over a period of four months. [Petitioner] indicated that this was in the amount of several ounces and then later indicated that the largest shipment that he received was over 200 grams. [Petitioner] then provided this methamphetamine to another individual for him to sell in order to help the [Petitioner] recoup the money that he believed he was owed based on the transaction over a vehicle." Dkt. 9-7 at 2-3. The IJ concluded that "because of the volume of narcotics involved in this case, the [Petitioner's] personal involvement in what is essentially wholesale distribution" that Petitioner had been convicted of a "particularly serious crime making him ineligible for asylum and withholding of removal." *Id.*

In his petition Petitioner asserts that "his conviction emanating from a car sales [sic] to a known drug dealer, whom owed Petitioner $6,000 from a car transaction, which proven hard to recoup, which forced Petitioner to get involved with the drugs, which led to his conviction." Dkt. 6 at 17-18. He further asserts that although he "made 129 phone calls to his con-conspirators 95% of the promises to meet resulted in nothing." *Id.*

1    Regardless of Petitioner's claimed rationale for his actions, Petitioner committed a

2    serious felony involving distribution of a controlled substance, and the Court finds the fourth

3    factor weighs in favor of the Government.[7] *See Juarez*, 2021 WL 2323436, at *6 (Concluding

4    that petitioner's conviction for Possession of a Controlled Substance (methamphetamine) and

5    Delivery of a Controlled Substance (methamphetamine) and 34 month sentence was sufficiently

6    significant for the "nature of the crime" factor to weigh in favor of the Government).

7        *4.    Conditions of Detention*

8        Under the fifth factor, the Court considers the conditions of Petitioner's detention at the

9    facility where he is detained. *Martinez*, 2019 WL 5968089, at *9. "The more that the conditions

10   under which the [non-citizen] is being held resemble penal confinement, the stronger [the]

11   argument that he is entitled to a bond hearing." *Jamal A. v. Whitaker*, 358 F. Supp. 3d 853, 860

12   (D. Minn. 2019) (citation and internal quotations omitted); *Juarez*, 2021 WL 2323436, at *6.

13       *a.    Petitioner's Allegations*

14       Petitioner asserts that the conditions where he is detained at NWIPC are similar or

15   possibly worse than he experienced at penal institutions. Dkt. 6 at 18-24. In support of his

16   argument, Petitioner cites to a decision from this district from 2020, *Katlong v. Barr.* Dkt. 6 at

17   18-24 (citing *Katlong v. Barr*, No. C20-0846-RSL-MAT, 2020 WL 7048530, at *4 (W.D. Wash.

18   Oct. 30, 2020), *report and recommendation adopted*, No. C20-0846-RSL-MAT, 2020 WL

19   7043580 (W.D. Wash. Dec. 1, 2020)). In *Katlong* the Court, in evaluating the conditions of

20   confinement factor under the *Martinez* test, determined that:

21       The evidence establishes at least the following. The NWIPC is a private detention facility
         run by The GEO Group, Inc. ("GEO"), an independent contractor with ICE that provides
22       the facility, management, personnel, and services for 24-hour supervision of the detainees
         in ICE custody at the NWIPC. The NWIPC has the capacity to house 1,575 detainees and

23   ─────────────────────────
     [7] Petitioner appears to acknowledge that this fourth factor weighs "slightly" in Respondent's favor. Dkt. 6
     at 18.

     REPORT AND RECOMMENDATION - 15

historically often operates near capacity. There are 21 housing units, one of which includes an Administrative Segregation Unit and a Disciplinary Management Unit. Detainees are housed according to classification level, and detainees of different classification levels may not ordinarily be housed together in the same housing unit. Male and female detainees are housed in separate units. Most movement within the facility is unit-specific, and detainees are allowed access to a small outdoor area for one hour a day. These conditions are "similar ... to those in many prisons and jails." *Jennings*, 138 S. Ct. at 861 (Breyer, J., dissenting) (determining that immigration detainees were held in circumstances similar to many penal institutions); *see also Guerrero-Sanchez v. Warden York Cnty. Prison*, 905 F.3d 208, 220 n.9 (3d Cir. 2018) ("[T]he reality [is] that merely calling a confinement 'civil detention' does not, of itself, meaningfully differentiate it from penal measures.") (quoted source omitted). Accordingly, this factor weighs in Petitioner's favor.

*Katlong*, 2020 WL 7048530, at *4.

Petitioner argues that the conditions of confinement at the NWIPC have not improved since the *Katlong* case but have, instead, gotten worse. Dkt. 6 at 18-24. Specifically, Petitioner notes that detainees are denied access to the internet pursuant to GEO policy. *Id.* He indicates there is a memo stating that the law library officer may not utilize the internet to do research for any detainee and only the provided paper-based publications and Lexis Nexis are available for detainee use. *Id.* Petitioner contends that this "effectively prohibits detainees from representing themselves in immigration proceedings as many detainees lack the financial resources." *Id.* He contends this policy interferes with detainees' access to evidence such as articles, newspaper articles, photos to use in their defense in removal proceedings. *Id.* He also argues this policy prevents detainees from obtaining relevant information within the country of removal in order to obtain relief under the Convention Against Torture. *Id.*

Petitioner further argues that incoming detainee mail is photocopied including family portraits and legal mail and that such measures are similar to those in prisons and jails. *Id.* Petitioner also alleges there are no contact visits at NWIPC unless specifically approved in emergency situations or for detainees getting removed, visits only last for about an hour,

1    detainees are subject to "frequent and unannounced searches... [and]... GEO staff utilize a 'pat

2    down' search as you move from a unit to other areas of the facility and back." *Id.*

3         Petitioner also contends the environment is unsanitary noting that the restroom stall #3

4    and 4 in Petitioner's pod have mold in them and restroom # 7 sometimes overflows with fecal

5    matter. *Id.* He alleges he is also subjected to "lack of proper medical care and medicines;

6    inadequate food; energy dense meals (high-fat, high-calorie foods); infringement of privacy;

7    torturous florescent lights that remain on 24 hours and seven days a week (causing severe vision

8    impairment and hamper[ing] detainees' sleep and sanity ultimately causing hopelessness);

9    overcrowding (less privacy, less access to mental and physical healthcare), including deaths in

10   custody." *Id.*

11        Petitioner alleges on one occasion, on May 19, 2024, a detainee attempted to commit

12   suicide and GEO staff used an un-sanitized mop bucket and mop head to clean up a substantial

13   amount of blood for two weeks and that this same equipment was used to clean the detainees'

14   living areas. *Id.*

15        Petitioner also alleges detainees are exposed to bird feces and maggots on a daily basis

16   when utilizing the "indoor rec" and that this is potentially harmful. *Id.*

17        *b.  The Government's Arguments*

18        The Government, in its motion to dismiss, contends that it is improper for the Court to

19   consider the conditions of confinement in considering a 28 U.S.C. § 2241 habeas corpus petition,

20   citing *Pinson v. Carvajal*, 69 F.4th 1059 (9th Cir. 2023). The Government also submits a

21   declaration from Ryan Jennings, a Supervisory Detention and Deportation Officer, with the DHS

22   ICE Enforcement and Removal Operations ("ERO"). Dkt. 9-1 (Decl. of Ryan Jennings).

23

1     In his declaration, Mr. Jennings states that the detained population at NWIPC has

2  dropped significantly and has not been near capacity for years and is generally less than 50%

3  capacity. *Id.* He indicates that currently the detained population at NWIPC is approximate 600

4  detainees. *Id.* Mr. Jennings acknowledges that detainees do not have unrestricted access to all

5  internet but asserts that they do have access to online legal resources at the law library and that

6  each detainee is provided a list of local free or reduced cost legal organizations/individuals that

7  can assist detainees in legal matters. *Id.* He indicates on August 27, 2024, he went to Petitioner's

8  unit to check the conditions of the stalls and observed some discoloration but no mold or

9  overflowing toilets. *Id.* He states he was told by a GEO officer that the toilets are routinely

10  cleaned and in good working order. *Id.*

11     Mr. Jennings states that detainees at NWIPC have free access to medical care on a daily

12  basis through ICE Health Services Corps with providers at NWIPC. *Id.* He states that for

13  necessary medical care that IHSC is not equipped to handle, referrals are made to outside

14  providers. *Id.* Mr. Jennings notes that Petitioner was seen in June and July 2014 by IHSC and

15  that he was referred out for an optometry appointment which took place on August 30, 2024, and

16  for which he obtained a prescription for eyeglasses. *Id.*

17     Mr. Jennings states that he was advised by GEO that all staff are trained on cleaning up

18  Blood Borne Pathogens (BBP) and that the GEO officer involved in the blood cleanup described

19  by Petitioner first cleaned the blood with cleaning solution and paper towels prior to mopping the

20  area. *Id.* However, after concerns were reported by detainees, the mop and bucket were replaced.

21  *Id.*

22     Mr. Jennings states that he was advised by GEO that the menu for detainees at NWIPC is

23  certified by a nutritionist and is about 3,000 calories per day. *Id.* He indicates the lights in each

1  detained unit are dimmed at night and the lights in the restroom area and doorway are left on for

2  safety. *Id.*

3       Mr. Jennings states that GEO responded to a report of a bird's nest in the outdoor fenced

4  recreation area by cleaning the area and checking it daily, but that removal of the bird nest was

5  not performed out of concern for potentially violating federal law. *Id.*

6           c.   *Petitioner's Response*

7       In response to the Government's motion to dismiss, Petitioner submits a declaration

8  largely reiterating the allegations in his petition. Dkt. 14. He also raises for the first-time

9  allegations that on a few occasions the drinking water has been brown, that he has experienced

10 some delays in medical treatment for his "chronic hip injury" and for "chronic constipation" and

11 that he witnessed blood being improperly cleaned on two other occasions. *Id.* Petitioner also

12 acknowledged that the lights in the living unit are dimmed at night but states that they still

13 interfere with his sleep. *Id.* Petitioner also appears to allege he believes the lights have caused the

14 high astigmatism in his eyes. *Id.* Petitioner also submits declarations from several other detainees

15 at NWIPC that echo Petitioner's statements regarding the toilet that sometimes overflowing,

16 concerns about possible mold on two of the doors in the bathroom, and inadequacy of the

17 cleaning, food, and healthcare. Dkts. 15, 16, 17, 18, 19, 20, 21.

18           d.   *Analysis of Relevant Conditions Under Martinez*

19       Petitioner asserts that the conditions where he is detained at NWIPC are similar or

20 possibly worse than he experienced at penal institutions. Specifically, Petitioner alleges that the

21 same restrictions at the NWIPC cited by the Court in *Katlong* have not changed or improved.

22 Petitioner cites specifically to the findings in *Katlong* that: the NWIPC has the capacity to house

23 1,575 detainees and historically often operates near capacity; it contains housing units including

an Administrative Segregation Unit and a Disciplinary Management Unit; detainees are housed according to classification level, and detainees of different classification levels may not ordinarily be housed together in the same housing unit; male and female detainees are housed in separate units; most movement within the facility is unit-specific; and detainees are allowed access to a small outdoor area for one hour a day.

The Government submits evidence disputing only one of these conditions - that NWIPC is operating near capacity – asserting instead that the facility has not been operating near capacity for several years and has instead generally been operating at less than 50% capacity. But the Government does not dispute that the other restrictions -- which the Court in *Katlong* found made the conditions of confinement factor weigh in petitioner's favor -- remain in effect.

The Government also does not submit evidence disputing Petitioner's allegations that incoming detainee mail, including family portraits and legal mail, is photocopied, that there are no contact visits unless specifically approved in emergency situations or for detainees getting removed, that visits only last for about an hour, and detainees are subject to frequent and unannounced searches, and staff utilize a "pat down" search as detainees move from a unit to other areas of the facility and back. Nor does the Government directly refute Petitioner's assertion that the conditions where he is detained at NWIPC are similar or possibly worse than those he experienced at penal institutions.

Accordingly, based upon the record before the Court, the Court finds this factor weighs in Petitioner's favor. *See Juarez*, 2021 WL 2323436, at *6 (concluding fifth factor favored the petitioner given allegations regarding "restrictions on privacy and autonomy" and "a focus on punitive discipline" at NWIPC); *Anyanwu v. United States Immigr. & Customs Enf't Field Off. Dir.*, No. 2:24-CV-00964-LK-GJL, 2024 WL 4627343, at *7–8 (W.D. Wash. Sept. 17, 2024),

1   *report and recommendation adopted sub nom. Anyanwu v. ICE Field Off. Dir.*, No. C24-0964

2   TSZ, 2024 WL 4626381 (W.D. Wash. Oct. 30, 2024) (finding petitioner's evidence that

3   "restrictions placed on his movements and conduct at NWIPC are similar to those restrictions

4   imposed in penal institutions" sufficient for this factor to weigh in petitioner's favor under

5   *Martinez* test).

6                    *e.   Analysis of Conditions as Separate Claim Under Fifth Amendment*

7           Although somewhat unclear, Petitioner also appears to argue that his conditions of

8   confinement at NWIPC are so severe that they independently violate the Fifth Amendment and

9   entitle him to immediate release.

10          The Court notes that generally, challenges to the legality or duration of confinement are

11  pursued in a habeas proceeding, *see Crawford v. Bell*, 599 F.2d 890, 891 (9th Cir. 1979), while

12  challenges to conditions of confinement are pursued in a civil rights action, *see Badea v. Cox*,

13  931 F.2d 573, 574 (9th Cir. 1991). Thus, this district court has found in the past that a habeas

14  petitioner's challenges to conditions of confinement were not properly pursued in an action

15  proceeding under 28 U.S.C. § 2241. *See, e.g., Calderon-Rodriguez v. Wilcox*, 374 F. Supp. 3d

16  1024, 1038 (W.D. Wash. 2019) (finding noncitizen's claim in his 28 U.S.C. § 2241 petition that

17  his detention, "given its length, multiple transfers, housing among criminal detainees and

18  prisoners, and 70 days in solitary confinement," had "crossed the line into punishment[,]" did not

19  belong in an immigration habeas action) (citing *Badea*, 931 F.2d at 574).

20          However, as noted in a recent decision from this district court, "this Court has, within the

21  context of immigration habeas proceedings, adjudicated Fifth Amendment conditions of

22  confinement claims related to the COVID-19 pandemic." *Doe v. Bostock*, No. C24-0326-JLR-

23  SKV, 2024 WL 3291033, at *5 (W.D. Wash. Mar. 29, 2024), *report and recommendation*

REPORT AND RECOMMENDATION - 21

1    *adopted*, No. C24-0326JLR-SKV, 2024 WL 2861675 (W.D. Wash. June 6, 2024) (citing *Juarez*

2    *v. Asher*, 556 F. Supp. 3d 1181, 1187-88 (W.D. Wash. 2021) (addressing Fifth Amendment

3    claims regarding the right to reasonably safe conditions), *Ortiz v. Barr*, C20-0497-RSM-BAT,

4    2020 WL 13577427, at *6-7 (W.D. Wash. Apr. 10, 2020) (addressing Fifth Amendment claim

5    that detention amounted to punishment), *Dawson v. Asher*, C20-0409-JLR-MAT, 2020 WL

6    1704324, at *8-9 (W.D. Wash. Apr. 8, 2020) (explaining the circumstances under which the

7    Court undertook consideration of COVID-19-related conditions of confinement claims in

8    petitions brought under 28 U.S.C. § 2241)).

9        In *Dawson*, the Court explained that:

10        The United States Supreme Court has not yet resolved the question of whether a
        conditions of confinement claim may be brought in the form of a petition for a writ of
11        habeas corpus. *See Bell v. Wolfish*, 441 U.S. 520, 526 n.6, 99 S.Ct. 1861, 60 L.Ed.2d 447
        (1979) ("Thus, we leave to another day the question of the propriety of using a writ of
12        habeas corpus to obtain review of the conditions of confinement, as distinct from the fact
        or length of the confinement itself."). The majority of federal circuit courts allow
13        detainees to challenge their conditions of confinement via a habeas petition. *See Aamer v.
        Obama*, 742 F.3d 1023, 1036-37 (D.C. Cir. 2014) (citing *United States v. DeLeon*, 444
14        F.3d 41, 59 (1st Cir. 2006); *Thompson v. Choinski*, 525 F.3d 205, 209 (2d Cir. 2008);
        *Woodall v. Fed. Bureau of Prisons*, 432 F.3d 235, 242 & n.5 (3d Cir. 2005); *McNair v.
15        McCune*, 527 F.2d 874, 875 (4th Cir. 1975); *Adams v. Bradshaw*, 644 F.3d 481, 482-83
        (6th Cir. 2011)). The Ninth Circuit has not yet decided the issue. *See Nettles v. Grounds*,
16        830 F.3d 922, 931 (9th Cir. 2016) (holding that if a state prisoner's claim "would not
        necessarily spell speedier release," it does not lie at "the core of habeas corpus," and must
17        be brought, if at all, under 42 U.S.C. § 1983; but explicitly stating that the Ninth Circuit
        would not address how this standard "applies to relief sought by prisoners in federal
18        custody").

19        Nevertheless, a three-judge panel on the Ninth Circuit recently transferred to this
        district several emergency motions in other matters that the Ninth Circuit construed as
20        habeas petitions. ... In those emergency motions, like Petitioners' TRO motions here, the
        detainees challenge their detention at the NWDC based on conditions that allegedly
21        increase the risk of COVID-19 infection. ... Like the Petition before this court, the
        transferred petitions challenge the conditions of confinement, not the fact or duration of
22        confinement. *See generally Almeida*, No. C20-0490RSM-BAT, Almeida Pet. (Dkt. # 1)

23

(W.D. Wash. Mar. 31, 2020); *Patel*, No. C20-0488RSM-BAT, Patel Pet. (Dkt. # 1)
(W.D. Mar. 31, 2020); *Pablo*, No. C20-489RSM-BAT, Pablo Pet. (Dkt. # 1) (W.D.
Wash. Mar. 31, 2020).

> The Ninth Circuit's transfer orders holding that this district court should consider the transferred emergency motions as habeas petitions are unpublished, and therefore the transfer orders do not definitively resolve this unsettled area of law. … Nevertheless, because both the transferred emergency motions are similar to present Petition, this court will follow the Ninth Circuit's direction in the transfer orders—to adjudicate the emergency motions as petitions for writs of habeas corpus under 28 U.S.C. § 2241—and consider the present Petition under the rubric of 28 U.S.C. § 2241 as well.

*Dawson*, 2020 WL 1704324, at *8-9.

Respondent cites to the Ninth Circuit's recent decision in *Pinson v. Carvajal*, 69 F.4th 1059 (9th Cir. 2023) in arguing that Petitioner's conditions of confinement claims are not properly considered in a § 2241 habeas petition. *Id.* In *Pinson*, the Ninth Circuit determined that a convicted prisoner's conditions of confinement claims raised in a § 2241 habeas petition did not sound in habeas and were therefore properly dismissed for lack of jurisdiction. *Id.* However, *Pinson* dealt with a habeas challenge to conditions of confinement brought by prisoners who had been convicted, and thus did not directly address this issue in the context of civil immigration detention. *Id.*

While the law is unclear as to whether Petitioner's claims may be properly considered in a 28 U.S.C. § 2241 petition, even assuming, without deciding, that Petitioner could raise these claims, he fails to demonstrate he is entitled to relief on this basis.

   i.     *Right to Reasonably Safe Conditions*

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989). The government violates the Due Process Clause if it fails to provide civil detainees

with "food, clothing, shelter, medical care, and reasonable safety." *Id.* at 200. In order to

establish such a claim, Petitioner must show:

> (i) The defendant made an intentional decision with respect to the conditions
> under which the plaintiff was confined;
> (ii) Those conditions put the plaintiff at substantial risk of suffering serious harm;
> (iii) The defendant did not take reasonable available measures to abate that risk,
> even though a reasonable officer in the circumstances would have appreciated the
> high degree of risk involved—making the consequences of the defendant's
> conduct obvious; and
> (iv) By not taking such measures, the defendant caused the plaintiff's injuries.

*Castro*, 833 F.3d at 1071; *see also Roman v. Wolf*, 977 F.3d 935, 943 (9th Cir. 2020)

(addressing reasonable safety claim raised by immigration detainees during the COVID-

19 pandemic).

With respect to the third element, the Government's conduct must be "objectively

unreasonable, a test that will necessarily 'turn on the facts and circumstances of each particular

case.'" *Castro*, 833 F.3d at 1071 (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015))

(alterations and internal quotation marks omitted). Objective unreasonableness requires "more

than negligence but less than subjective intent—something akin to reckless disregard." *Castro*,

833 F.3d at 1071 (quoted source omitted). "To satisfy the fourth element, a plaintiff need only

prove a 'sufficiently imminent danger[ ],' because a 'remedy for unsafe conditions need not

await a tragic event.'" *Roman*, 2020 WL 6040125, at *6, 977 F.3d 935 (quoting *Helling v.*

*McKinney*, 509 U.S. 25, 33–34 (1993)).

Petitioner contends that the Government has subjected him to unsanitary conditions

noting that two of the restroom stalls in Petitioner's pod appear to have mold in them and one of

the toilets sometimes overflows with fecal matter. He alleges he is also subjected to lack of

proper medical care and medicines; inadequate food; energy dense meals (high-fat, high-calorie

foods); infringement of privacy; torturous florescent lights that remain on 24 hours and seven

days a week; overcrowding; and that deaths have occurred in custody. Petitioner alleges on one occasion a detainee attempted to commit suicide and GEO staff did not properly sanitize or clean the area. Petitioner also alleges detainees are exposed to bird feces and maggots on a daily basis when utilizing the "indoor rec" and that this is potentially harmful.

Many of Petitioner's allegations, in particular his allegations related to dissatisfaction with the food, inadequate medical care, overcrowding, and exposure to bird feces and maggots in the rec area are too generalized and conclusory to establish a Fifth Amendment violation. Furthermore, the Government has submitted evidence specifically refuting some of Petitioner's generalized allegations and demonstrating that measures have been taken to address the other issues raised by Petitioner. Specifically, the Government has submitted evidence that the detained population at NWIPC has been operating below capacity for years and is generally operating at less than 50% capacity; the food provided is certified by a nutritionist and is about 3,000 calories per day; Officer Jennings inspected the bathrooms in question and found discoloration but not mold and no overflowing toilets[8]; Petitioner has access to medical care and has been seen by medical and referred to an outside provider related to his eye issues; GEO staff are trained in cleaning Blood Borne Pathogens and that officers cleaned the area with cleaning solution and towels prior to mopping, and then replaced the mop and bucket when concerns were

---

[8] The Court also notes that an occasionally overflowing toilet (particularly where it is not the only toilet available) without more would also not rise to the level of a Fifth Amendment violation.

1  voiced by detainees; the lights are dimmed at night in the living units[9]; GEO staff responded to

2  reports of a birds nest in the rec area by cleaning the area and checking it daily.[10]

3     The Court concludes that on this record Petitioner has not demonstrated that he faces a

4  substantial risk of serious harm due to the current conditions of his detention and that the

5  Government has failed to take reasonable measures to abate any such risk. Accordingly,

6  Petitioner has not established a separate independent Fifth Amendment violation on this basis.

7      *ii.*   *Conditions Amounting to Punishment*

8     Petitioner also appears to argue that his confinement amounts to unconstitutional

9  punishment.

10     To evaluate the constitutionality of a pretrial or civil detention condition under the Fifth

11  Amendment, a district court must determine whether those conditions "amount to punishment of

12  _____

13  [9] The Court notes that in his response to the Government's evidence Petitioner acknowledges that the
lights are in fact dimmed at night but argues that they are not sufficiently dimmed and still affect his
sleep. Dkt. 13. But Petitioner's general allegation that the dimmed lights still affect his sleep to some

14  degree and his speculative assertion that he believes the lighting has affected his eyesight are not
sufficient, without more, to establish a constitutional violation.

15  
16  [10] The Court notes that in response to the Government's motion to dismiss, Petitioner raises several
allegations for the first-time including that on a few occasions the drinking water has been brown, that
he has experienced some delays in medical treatment for his "chronic hip injury" and for "chronic

17  constipation" and that he has witnessed blood being improperly cleaned on two other occasions. Dkt. 13.
Petitioner also submits declarations from several other detainees at NWIPC that echo Petitioner's

18  statements regarding the toilet that sometimes overflows, concerns about possible mold on two of the
doors in the bathroom, and inadequacy of the cleaning, food and healthcare. Dkts. 15, 16, 17, 18, 19, 20,
21. These new arguments, presented for the first time in response to the Government's motion to dismiss,

19  are not properly before the Court. *See See Zamani v. Carnes,* 491 F.3d 990, 997 (9th Cir.2007) ("The
district court need not consider arguments raised for the first time in a reply brief."); *Czapla v. Dep't of*

20  *Corr.*, No. C11-317-JCC-JPD, 2011 WL 6884679, at *5 (W.D. Wash. Aug. 8, 2011), *report and
recommendation adopted*, No. C11-0317-JCC, 2011 WL 6887123 (W.D. Wash. Dec. 29, 2011) ("To the
extent that [the habeas] petitioner seeks to add completely new claims in his reply to respondent's answer

21  …, those claims are not properly before the Court because they were raised for the first time in the reply
brief."). However, even if the Court were to consider these new allegations, they fail to establish a

22  violation of the Fifth Amendment as applied to Petitioner.

23

the detainee." *Bell*, 441 U.S. at 535; *see also Kingsley*, 576 U.S. at 398. Punishment may be shown through an express intent to punish or a restriction or condition that "is not reasonably related to a legitimate governmental objective." *Bell*, 441 U.S. at 539; *see also Kingsley*, 576 U.S. at 398 (clarifying that "a pretrial detainee can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose").

Here, Petitioner presents no evidence of an express intent to punish. Furthermore, the Supreme Court has recognized "a legitimate government interest in ensuring noncitizens appear for their removal or deportation proceedings and protecting the community from harm." *Bryan v. ICE Field Off. Dir.*, No. 221CV00154BHSTLF, 2021 WL 4556148, at *4 (W.D. Wash. June 14, 2021), *report and recommendation adopted*, 2021 WL 4552442 (W.D. Wash. Oct. 5, 2021) (citing *Jennings v. Rodriguez*, 583 U.S. 281, 285-88 (2018), *Demore*, 538 U.S. at 520–22, *Zadvydas v. Davis*, 533 U.S. 678, 690–91 (2001)).

As discussed above, Petitioner fails to demonstrate the current conditions of his detention place him at substantial risk of serious harm. And on the current record, the Court concludes Petitioner has failed to present "objective evidence the challenged governmental action[s are] not rationally related to a legitimate governmental objective or that [they are] excessive in relation to that purpose." *Kingsley*, 576 U.S. at 398. Accordingly, the Court finds Petitioner has also not established a separate independent Fifth Amendment violation on this basis.

Finally, Petitioner fails to demonstrate that even if the alleged Fifth Amendment violations could be established, that they would warrant or require immediate release. Rather, as this district court has previously held, "[e]ven if Petitioner could show a Fifth Amendment violation, he does not establish that such a violation would justify immediate release, as opposed

1    to injunctive relief that would leave him detained while ameliorating any unconstitutional

2    conditions at the NWIPC." *Ortiz v. Barr*, No. C20-497-RSM-BAT, 2020 WL 13577427, at *7

3    n.8 (W.D. Wash. April 10, 2020); *accord Doe v. Bostock*, 2024 WL 3291033, at *8.

4        5.    *Delays in Removal Proceedings*

5        Under the sixth and seventh factors, the Court considers "the nature and extent of any

6    delays in the removal proceedings caused by the petitioner and the government, respectively."

7    *Martinez*, 2019 WL 5968089, at *10. "Petitioner is entitled to raise legitimate defenses to

8    removal ... and such challenges to his removal cannot undermine his claim that detention has

9    become unreasonable." *Liban M.J.*, 367 F. Supp. 3d at 965 (citing *Hernandez v. Decker*, 2018

10   WL 3579108, at *9 (S.D.N.Y. July 25, 2018) ("[T]he mere fact that a noncitizen opposes his

11   removal is insufficient to defeat a finding of unreasonably prolonged detention, especially where

12   the Government fails to distinguish between bona fide and frivolous arguments in opposition.")).

13   Thus, this factor only weighs against a petitioner when he "has 'substantially prolonged his stay

14   by abusing the processes provided'" but not when he "simply made use of the statutorily

15   permitted appeals process." *Hechavarria v. Sessions*, 891 F.3d 49, 56 n.6 (2d Cir. 2018) (quoting

16   *Nken v. Holder*, 556 U.S. 418, 436 (2009)). With respect to the Government, "[i]f immigration

17   officials have caused delay, it weighs in favor of finding continued detention unreasonable ....

18   Continued detention will also appear more unreasonable when the delay in the proceedings was

19   caused by the immigration court or other non-ICE government officials." *Sajous*, 2018 WL

20   2357266, at *11.

21       Both parties argue that the other party should be charged for delays in the case. The

22   Government argues that Petitioner has delayed proceedings by requesting several continuances at

23   the beginning of his removal proceedings to seek counsel and to prepare his materials as well as

by appealing decisions finding him removable. Dkt. 9. However, absent evidence of bad faith or deliberate delay, these requests for what amounted to relatively brief continuances of a few months to seek counsel and prepare materials should not, in the Court's opinion, weigh against Petitioner. *See Martinez*, 2019 WL 5968089, at *10 (finding the sixth factor (delays attributable to petitioner) weighed in petitioner's favor where there was no indication petitioner engaged in deliberate delay tactics but that he merely requested two reasonable continuances (totaling 4-5 months) so he could prepare and file a motion to terminate and applications for relief from removal). Furthermore, with respect to Petitioner's appeals, there is no evidence Petitioner has "substantially prolonged his stay by abusing the processes provided.'" *Hechavarria*, 891 F.3d at 56 n.6 (quoting *Nken*, 556 U.S. at 436). Rather, based on the record before the Court, it appears Petitioner has "simply made use of the statutorily permitted appeals process." *Id.* Accordingly, the Court finds this sixth factor weighs in favor of Petitioner.

Petitioner asserts that he was never issued a briefing schedule or transcript prior to the dismissal of his initial appeal to the BIA of the IJ's August 30, 2023, order of removal. Dkt. 6 at 15-16. Petitioner indicates that despite this fact the BIA issued a decision affirming the IJ's decision on January 18, 2024. *Id.* Because of this he indicates he moved to reopen the BIA's decision and it then took the BIA an "extra 7 months to adjudicate the merits of this case[.]" *Id.* The Government did not address Petitioner's argument in its response and, although the record is not entirely clear, the record before the Court does appear to reflect that the January 18, 2024, BIA decision was vacated, that a new decision was issued seven months later in July 2024, and that the second BIA decision is now on appeal in the Ninth Circuit.

Although there is no indication in the record that this delay was tactical or deliberate on the part of the Government, Courts have found delays caused by the immigration court to be

attributable to the Government. *See Martinez*, 2019 WL 5968089, at *10 (finding delays

stemming from the immigration court's crowded docket attributable to the Government);

*see Sajous*, 2018 WL 2357266, at *11 ("the operative question should be whether the

[noncitizen] has been the cause of the delayed immigration proceeding and, where the fault is

attributable to some entity other than the [noncitizen], the factor will weigh in favor of

concluding that continued detention without a bond hearing is unreasonable"); *Durkay v. Decker*,

No. 18-2898, 2018 WL 5292130, at *4 (S.D.N.Y. Oct. 25, 2018) (delay caused by immigration

court weighed in favor of the petitioner). Furthermore, the Government has not disputed

Petitioner's assertions regarding the cause and nature of this delay. Accordingly, on the current

record, the Court finds the seventh factor also favors Petitioner.

      *6.*     *Likelihood Removal Proceedings Will Result in a Final Order of Removal*

      Finally, under the eighth factor, the Court considers "the likelihood that the removal

proceedings will result in a final order of removal." *Liban M.J.*, 367 F. Supp. 3d at 965. "In other

words, the Court considers whether the noncitizen has asserted any defenses to removal."

*Martinez*, 2019 WL 5968089, at *10; *Sajous*, 2018 WL 2357266, at *11. "Where a noncitizen

has not asserted any grounds for relief from removal, presumably the noncitizen will be removed

from the United States, and continued detention will at least marginally serve the purpose of

detention, namely assuring the noncitizen is removed as ordered." *Id.* at *10. "But where a

noncitizen has asserted a good faith challenge to removal, 'the categorical nature of the detention

will become increasingly unreasonable.'" *Id.* (quoting *Reid v. Donelan*, 819 F.3d 486, 495 (1st

Cir. 2016).

      There is insufficient information available at this time for the Court to predict whether

Petitioner's removal proceedings will result in a final order of removal. It appears the IJ and the

BIA have rejected Petitioner's challenges to his removal, but Petitioner currently has a petition for review pending in the Ninth Circuit. The Court declines to conclude on the current record before the Court whether Petitioner is likely to prevail on his appeal. *See Juarez*, 2021 WL 2323436, at *7 ("Petitioner does, however, have a petition for review pending before the Ninth Circuit and this Court is unwilling to conclude, based on the record before it, that the appeal is frivolous or that Petitioner will not ultimately prevail. The Court therefore finds this factor neutral.").

Given the limited information currently available to the Court, the Court finds this factor weighs neutrally.

7.    *Weighing the Factors*

As discussed above, six of the eight factors weigh in Petitioner's favor, one factor weighs in the Government's favor, and the remaining factor is neutral. On this record, the Court concludes that the factors in Petitioner's favor outweigh those favoring the Government. Accordingly, the Court concludes Petitioner's prolonged mandatory detention under § 1226(c) has become unreasonable such that an individualized bond hearing is required to comport with due process.

**D.    Bond Hearing**

Where the Court has determined that a § 1226(c) detainee has been subjected to unreasonably prolonged detention in violation of due process, this Court has repeatedly found the proper remedy to be a bond hearing conducted in accordance with the requirements of *Singh v. Holder*, 638 F.3d 1196 (9th Cir. 2011) wherein the government bears the burden of proving the detainee is a danger or flight risk by clear and convincing evidence. *See, e.g., Anyanwu.*, 2024

1    WL 4627343, at *7–8; *Juarez*, 2021 WL 2322823; *Pasillas v. ICE Field Off. Dir.*, No. 21-cv-

2    681-RAJ-MLP, 2022 WL 1127715 (W.D. Wash. Apr. 15, 2022).

3         The Government argues that if the Court orders a bond hearing the burden of proof

4    should be placed upon the Petitioner, citing to *Jennings v. Rodriguez*, 583 U.S. 281 (2018) and

5    *Rodriguez Diaz v. Garland*, 53 F.4th 1189 (9th Cir. 2022).

6         However, as another decision from this district court recently explained: "[although in

7    *Jennings*] the Supreme Court reversed *Singh* and other Circuit decisions that interpreted §

8    1226(c) and similar statutory provisions to include implicit procedural protections … [f]ollowing

9    *Jennings*, … this Court and other district courts continue to apply the reasoning in *Singh* to

10   conclude that § 1226(c) detainees are entitled to bond hearings as a matter of constitutional due

11   process rather than implicit statutory guarantees." *Anyanwu*, 2024 WL 4627343, at *7–8;

12   *Jimenez v. Current or Acting Field Off. Dir., San Francisco Field Off., United States Immigr. &*

13   *Customs Enf't*, No. 23-CV-03566, 2024 WL 714659, at *9 (N.D. Cal. Feb. 21, 2024) (concluding

14   that "*Singh*'s holding on the burden of proof was based on constitutional due process principles

15   rather than any interpretation of the statute"); *Juarez*, 2021 WL 2323436, at * 8 (collecting

16   cases); *Gonzalez v. Bonnar*, No. 18-CV-05321, 2019 WL 330906, at *7 (N.D. Cal. Jan. 25,

17   2019) ("[N]early all the courts that have granted habeas petitions in 1226(c) cases post-*Jennings*

18   have held that the government bears the burden of proof by clear and convincing evidence.")

19   (citation omitted).

20        In *Rodriguez Diaz*, the Ninth Circuit declined to extend the procedural requirements of

21   *Singh* to individuals detained under § 1226(a), finding "existing agency procedures" provided

22   them sufficient protection. 53 F.4th 1189. But in *Rodriguez Diaz*, the detainee was detained

23   under § 1226(a) and thus pursuant to the statute and its implementing regulations, he "received

an individualized bond hearing shortly after the start of his detention and had a continuing right

to request release on the basis of changed circumstances." *Jimenez*, 2024 WL 714659, at *8, n. 7;

*and see* 8 U.S.C. § 1226(a); 8 C.F.R. §§ 236.1, 1003.19; *Rodriguez Diaz*, 53 F.4th at 1202

(noting that § 1226(a) "stands out from the other immigration detention provisions in key

respects. Section 1226(a) and its implementing regulations provide extensive procedural

protections that are unavailable under other detention provisions, including several layers of

review of the agency's initial custody determination, an initial bond hearing before a neutral

decisionmaker, the opportunity to be represented by counsel and to present evidence, the right to

appeal, and the right to seek a new hearing when circumstances materially change."). Thus, it

was "only in the context of these procedural protections already afforded to the noncitizens

detained under Section 1226(a) that *Rodriguez Diaz* concluded noncitizen detainees had no

constitutional right to additional bond hearings based solely on the passage of time." *Jimenez*,

2024 WL 714659, at *8, n. 7; *Rodriguez Diaz*, 53 F.4th at 1202. Accordingly, *Rodriguez Diaz* is

distinguishable from the instant case as it did not address the question of whether *Singh*

continues to apply to § 1226(c) detainees (and more specifically those who have not had a bond

hearing of any kind) on constitutional grounds.

Although it appears "the applicability of *Singh* to the constitutional rights of noncitizens

detained under § 1226(c) remains an open question in the Ninth Circuit", *Anyanwu*, 2024 WL

4627343, at *7–8, the Ninth Circuit has signaled in other cases that the burden of proof legal

standard articulated in *Singh* continues to apply for immigration detainees subject to prolonged

detention. *Id.* (citing *Martinez v. Clark*, 36 F.4th 1219, 1230–31 (9th Cir. 2022), *judgment

vacated on other grounds*, 144 S. Ct. 1339 (2024) (finding the BIA applied the correct legal

standard in requiring the Government to prove by clear and convincing evidence that a

noncitizen detained under § 1226(c) was a danger to the community); *Aleman Gonzalez v. Barr* 955 F.3d 762, 766 (9th Cir. 2020), *rev'd on other grounds sub nom. Garland v. Aleman Gonzalez*, 596 U.S. 543 (2022) (affirming the district court decision requiring the government to bear a heightened burden of proof at a bond hearing for a § 1231(a)(6) detainee as a matter of due process)).

The Court also notes that many district courts in the Ninth Circuit, including this Court, have continued to apply *Singh* to § 1226(c) cases. *See, e.g., Anyanwu*, 2024 WL 4627343, at *7–8; *Salesh P. v. Kaiser*, No. 22-cv-01785, 2022 WL 17082375 (N.D. Cal. Nov. 17, 2022); *Singh v. Garland*, No. 1:23-cv-01043, 2023 WL 5836048 (E.D. Cal. Sept. 8, 2023); *Durand v. Allen*, No. 3:23-cv-00279, 2024 WL 711607 (S.D. Cal. Feb. 21, 2024).

Therefore, the Court finds Petitioner is entitled to a bond hearing where the Government bears the burden of proving by clear and convincing evidence that Petitioner is a flight risk or danger to the community.

**E.    Request for TRO**

Petitioner's petition also appears to include a request for a TRO. Dkt. 6 at 30-36. However, in requesting a TRO, Petitioner seeks the same relief that he requests in the petition – an order requiring the Government to provide him with a bond hearing or immediately release from custody. Accordingly, Petitioner's request for a TRO (Dkt. 6) should be DENIED as moot.

## CONCLUSION

For the foregoing reasons, the Court recommends that the Government's motion to dismiss (Dkt. 9) and Petitioner's federal habeas petition (Dkt. 6) should be GRANTED in part and DENIED in part. Specifically, the Court recommends that Petitioner's request for release should be DENIED but he should be GRANTED a bond hearing that comports with the

procedural requirements of *Singh* within 30 days of an order on this Report and

Recommendation. Petitioner's request for a TRO (Dkt. 6) should also be DENIED as moot. The

Court further recommends that Petitioner's motion to substitute (Dkt. 12) be GRANTED and that

Bruce Scott, the warden of NWIPC, be substituted as the Respondent in this action. A proposed

Order accompanies this Report and Recommendation.

## OBJECTIONS

Objections to this Report and Recommendation, if any, should be filed with the Clerk and

served upon all parties to this suit no later than **December 11, 2024**. The Clerk should note the

matter for **December 13, 2024**, as ready for the District Judge's consideration if no objection is

filed. If objections are filed, any response is due within 14 days after being served with the

objections. A party filing an objection must note the matter for the Court's consideration 14 days

from the date the objection is filed and served. The matter will then be ready for the Court's

consideration on the date the response is due. The failure to timely object may affect the right to

appeal.

DATED this 27th day of November, 2024.

_____
BRIAN A. TSUCHIDA
United States Magistrate Judge

REPORT AND RECOMMENDATION - 35